UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:16-CR-00117-JRG |
| | ) | |
| vs. | ) | |
| | ) | |
| APRIL WEST, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court pursuant to 28 U.S.C. § 636 and standing orders of the District Court. Before the Court is Defendant April West's ("West") motion to suppress [Doc. 11]. The Government has filed its response in opposition [Doc. 12], and the Court conducted an evidentiary hearing on the motion on January 4, 2017. The matter is now ripe for resolution.

**I.  PROCEDURAL BACKGROUND**

On October 12, 2016, the grand jury indicted West for knowingly, intentionally, and without authority possessing with the intent to distribute a quantity of a mixture and substance containing a detectable amount of cocaine base ("crack"), in violation of Title 21, United States Code, section 841(a)(1). On December 21, 2016, West filed a motion to suppress. [Doc. 11]. In her motion, West seeks the suppression of all evidence seized from the vehicle and her person pursuant to a warrantless search conducted on August 12, 2016. However, at the evidentiary hearing conducted on January 4, 2017, defense counsel informed the Court that the only evidence West seeks to suppress is the evidence seized from her person, not the evidence seized from the search of her vehicle or purse.

1

## II. FINDINGS OF FACT

At the evidentiary hearing, the only witnesses to testify were Detective Pete Shockley and the Defendant. Based on the testimony from the hearing, the Court makes the following findings of fact.

On August 12, 2016, officers with Morristown Police Department received a tip from a reliable confidential informant that West had traveled to Knoxville to purchase narcotics. The informant also told law enforcement that she was driving a rented red sedan, and that she was expected to return to the Morristown area around 7:30 p.m. Officers had used this informant in the past who had previously provided reliable information. Based on this information, officers prepared for West's return that evening.

At roughly 8:00 p.m. that evening, Detective Jackie Hickey identified West driving a red Ford Focus on West Andrew Johnson Highway coming from the Jefferson City area. Detective Hickey called Detective Pete Shockley to report the information, who informed Detective Jason Young. All of these officers were located in separate locations awaiting West's return. West proceeded to speed past Detective Jason Young, who determined that West was driving in excess of the posted speed limit in violation of Tennessee Code section 55-8-152. He also noticed a decal on the back of the red sedan indicating the vehicle was rented. Detective Young contacted Captain Dan Cliff, who located West on Wedgewood Drive. Captain Cliff activated his emergency lights behind West, but she continued to drive her vehicle despite Captain Cliff's attempt to stop her.

Canine Officer Lucas Watson, who was traveling in the opposite direction of West, used his vehicle to block her from continuing on her route. Only after she was effectively blocked in

2

by multiple police cars did she stop driving.[1] West's vehicle was stopped near the intersection of Delana Drive and Central Church Road. This location is approximately a block and a half from West's residence. Officer Watson's vehicle was equipped with a dashboard camera ("dash cam"), which recorded the video and audio of nearly all of the ensuing traffic stop. His person was also equipped with a "body cam" that recorded the video and audio of approximately the first five minutes of the traffic stop.[2] The dash cam footage shows West sitting in the driver's seat of her vehicle immediately after stopping her car. West is seen to be looking downwards and making furtive movements. No other occupants were in the car.

Officers then approached West and ordered her to raise her hands. She complied. She then opened her car door. One officer asked her why she did not comply with the blue lights and stop earlier. She responded that she just did not know. The officer asked for her driver's license, which West provided. She then asked to smoke a cigarette. One officer then advised her to turn off her car and step out of the car. She handed her pack of cigarettes to an officer who inspected the package and handed her a cigarette. She then exited the vehicle. As soon as West exited the car, Detective Shockley noticed a "fresh" tampon on the ground in the immediate vicinity of the driver's side door of West's vehicle. He asked "What's this?" West claimed that it was not hers. Detective Hickey patted-down West to check for any weapons. At this point, nothing was found on her person. It is undisputed that no other officers touched West or brandished any weapons during the course of this encounter.

---

[1] West testified from the time she first saw the police lights activated, it took her approximately less than five minutes to stop but could not give any more specificity than that.

[2] The body cam footage was introduced into evidence at the hearing as Exhibit 3, and the dash cam video as Exhibit 4.

Once West had exited the vehicle, Detective Shockley asked for permission to search West's vehicle, which she promptly gave him. [Exhibit 4, 2:50]. "Go ahead," she said. Roughly three minutes after West consented to the search, Officer Watson brought in Baxil, a trained narcotic-sniffing dog, to conduct a "sweep" of the exterior of the vehicle. Baxil "alerted" for the presence of narcotics near the driver's side door, where West had exited a few minutes prior. [Exhibit 4, 6:00]. Officers continued to search the vehicle in the presence of West and found two cell phones, a GPS unit, and West's purse. Officers then requested permission to search her purse, which she gave. In the purse, officers found $1,064 in cash. No other evidence was discovered in the vehicle. Throughout the time that the officers searched her vehicle, the dash cam depicts West walking around, engaging in discussion with officers, and also laughing with officers.

After searching the vehicle for approximately thirty minutes, Detective Shockley began talking to West at the rear of her vehicle. During their conversation, Detective Shockley stated that they knew she went to get drugs from Knoxville and in fact, law enforcement witnessed her in that city. West then asked Shockley to step out of earshot of the other officers. Detective Shockley complied, and they moved out of visual range of the dash cam. At this point, West told Detective Shockley that she did not want to go back to federal prison, and that she did, in fact, have narcotics on her person. Shockley asked her where the drugs were on her person. In response, West indicated she had hidden them inside her body. Shockley asked her to remove the drugs and place them on the ground. After West agreed, he promptly turned his back so as not to watch. West then placed a bag containing four smaller bags of drugs on the ground. In total, West produced 19.2 grams of crack cocaine, 1.2 grams of methamphetamine, and an assortment of 67

4

pills consisting of various controlled substances such as morphine, oxycodone, opana, and valium.[3] West was subsequently placed in a squad car and taken into custody.

West testified that after she noticed the blue lights, she continued to drive her vehicle for less than five minutes. She claimed that she did not attempt to "out run" the police. She acknowledged that officers asked to search her vehicle and her purse, and that she voluntarily consented to their request. She insisted that the fresh tampon found right by the driver's side door was not hers. She claimed that she felt threatened by the officers and that Shockley continued to yell at her during the course of the stop. She acknowledged that she and Shockley discussed her involvement in procuring drugs and that Shockley advised her that he was going to get a warrant for her arrest. At that point, she admitted that she asked Shockley to step over away from the other officers so that she could talk privately with him. She testified that her intention was to disclose to Shockley that she had the drugs on her person. She admits that she voluntarily disclosed to Shockley that she had the drugs and that they were hidden in her body. She differs from Shockley's version by claiming that he did not turn away, but ordered her to produce the drugs in his presence. She claimed this was extraordinarily embarrassing for her to produce the drugs that she had hidden in her body.

The Court finds some of West's testimony to be incredible. She claimed she had hidden the drugs in her body when she was in Knoxville. The Court finds that incredible. It appears from the video and the testimony of Detective Shockley that she was hiding the drugs when she stopped her vehicle. She also disclaimed ownership of the fresh tampon that was found right by the driver's side door. That claim, while plausible, is inconsistent with the fact that when she removed the

---

[3] As of the date of the evidentiary hearing, these items are in possession of the Tennessee Bureau of Investigation for laboratory testing. Results are expected within the next thirty to sixty days.

5

drugs from her body, the bag had blood on it. The Court also finds her testimony incredible as it is inconsistent with the dash cam. At the hearing, she claimed officers were threatening her and yelling at her. However, on the video, she is seen smoking, talking with them, joking with them, smiling, walking around freely, folding up some articles of clothing she had removed from the trunk, and looking in the car for a bottle of water.

## III.   DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). There are three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith,* 594 F.3d 530, 535 (6th Cir. 2010). "While purely consensual encounters are not subject to Fourth Amendment scrutiny, *see Florida v. Bostick,* 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L.Ed.2d 389 (1991), all seizures—including brief investigatory stops—receive this protection, *see Smith,* 594 F.3d at 535." *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011).

"A seizure occurs when a reasonable person would have believed that he was not free to leave." *Mitchell v. United States*, 233 F. App'x 547, 550 (6th Cir. 2007). "In order to determine if a seizure has occurred, [courts should] look to 'all of the circumstances surrounding the incident' and consider whether 'a reasonable person would have believed that he was not free to leave.'" *Beauchamp*, 659 F.3d at 566 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Whether an encounter is consensual depends on the officers' objective behavior. The officers'

6

subjective beliefs are irrelevant, unless communicated to the defendant." *Mitchell*, 223 F. App'x at 550.

In the instant matter, after receiving a tip from a confidential informant, officers effected a traffic stop based on probable cause that West was operating her vehicle in excess of the posted speed limit. Detective Young witnessed her speeding and contacted the other officers for assistance in making a traffic stop. *See United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012) (collective knowledge doctrine allows a responding officer to execute a stop at the request of an officer who possesses the facts necessary to form the basis of the stop). Indeed, numerous law enforcement vehicles were required to block in her in order to halt her attempt to evade them. Based upon the speeding, the initial seizure of West was lawful. *Whren v. Unite States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Within minutes of the traffic stop, West voluntarily consented for officers to search her vehicle and her purse. Importantly, at no point has West challenged the validity of her consent or that the search exceeded the scope of her consent or was conducted in an unreasonable period of time.[4] The video directly contradicts her testimony that officers were threatening her during the search. Indeed, the dash cam shows her walking around, conversing and laughing with various officers, and smoking cigarettes. At no point did West withdraw her consent or even claim that she told law enforcement that she wanted to leave.

---

[4] While it is not an issue in this case, even had West not given consent, Baxil, the trained narcotic-sniffing dog, positively alerted to the presence of narcotics. This positive alert gave officers probable cause to search the vehicle. *See United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008).

While the officers were searching her vehicle, West asked Detective Shockley to step out of earshot of the other officers. Crucially, West testified that her purpose in doing this was to discuss the drugs with him, which she produced for him within minutes. Notably, the two were in eyesight of the other officers despite being out of sight of the dash cam, and she conceded that Detective Shockley never touched her during this encounter.

West was cooperative and nonchalant in her actions throughout the entire traffic stop. No evidence of coercion or threatening behavior can be seen in the video, and West's claims to the contrary are not afforded any weight. She initiated the encounter that ultimately resulted in her producing the narcotics she had hidden in her body. She asked Shockley to step aside and then disclosed to him that she had possession of the drugs. While it is true, Shockley could have asked the female officer who was present on the scene to step over and witness West remove the drugs from her person, that he did not does not result in a constitutional violation. Shockley testified that he turned his back so as not to subject West to any embarrassment that might occur as a result of his presence there with her.

Thus, the Court finds that this particular encounter West had with law enforcement was permissible and not violative of the Fourth Amendment's prohibition against unreasonable searches and seizures. Accordingly, the Court finds defense counsel's arguments that a search of West's person occurred —illegal or otherwise— without merit. The totality of the evidence indicates that West voluntarily admitted to possessing and producing the narcotics. Therefore, the Court respectfully RECOMMENDS that Defendant's motion to suppress be DENIED.[5]

---

[5] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).

SO ORDERED:

s/Clifton L. Corker
United States Magistrate Judge